# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
   **Plaintiff,**

 v.                  **Case No. 09-CR-65**

**THOMAS H. BUSKE**
   **Defendant.**

## DECISION AND ORDER

### I. BACKGROUND

The government indicted defendant Thomas Buske on six counts of mail fraud (counts 1-6), six counts of interstate transportation of stolen goods (counts 7-12), conspiracy to commit money laundering (count 13), seven counts of money laundering under 18 U.S.C. § 1956 (counts 14-20), and three counts of money laundering under 18 U.S.C. § 1957 (counts 21-23). The indictment alleged that defendant, owner of an Illinois trucking firm, schemed to defraud the S.C. Johnson Company ("SCJ") by submitting fraudulent invoices for transportation services; that an employee of SCJ, Milt Morris, approved the invoices for payment, knowing them to be false, in exchange for kick-backs; and that defendant engaged in various unlawful financial transactions with the proceeds of the fraud. The government later dismissed counts 13-20 (the § 1956 money laundering counts).[1]

In 2004, SCJ filed a civil suit against Morris, defendant and his companies, and others,

---

[1] Counts 1-6 pertain to payments SCJ sent defendant; counts 7-12 to the transportation of alleged kick-backs from Illinois to Wisconsin; and counts 21-23 to checks defendant wrote at a casino in Las Vegas with alleged proceeds of the fraud.

in state court. Discovery in the case lasted several years, and in 2008 a jury returned a verdict in favor of SCJ in excess of $200,000,000. Defendant indicates that after judgment was entered, SCJ continued to conduct discovery as part of supplemental proceedings (presumably pertaining to collection of the judgment). Defendant was indicted in this case in March 2009. Morris, charged separately, pleaded guilty before another judge in this district and agreed to cooperate with the government.

Defendant's case had been set for trial in June 2011, but after a discovery dispute arose I adjourned the trial and set a briefing schedule on defendant's motion to compel discovery. In his papers, defendant generally argued that the government and SCJ coordinated their efforts in the criminal investigation and civil litigation; he thus claimed that SCJ and its lawyers should be considered part of the government's team for purposes of the government's discovery obligations in this case. The government responded that it and SCJ pursued independent investigations, and that while SCJ shared some information with the government there is no basis for concluding that SCJ is part of the prosecution team. The government also pointed out that defendant had access to what is probably a far greater volume of material in the civil case, much of it generated by SCJ, than has been (or need be) produced under the government's open file policy and federal discovery rules.

I held a hearing on the motion on July 12, 2011, then ruled from the bench. This memorandum expands on the reasons for my rulings. Defendant made various specific requests, some related to SCJ, others not, which I discuss below.

## II.  REQUESTS UNRELATED TO SCJ

**A.   Documents and Materials Used in Witness Interviews:**

In his original motion, defendant sought the following:

•   a copy of the document shown to Milt Morris in his September 21, 2006, interview, listing his travel dates, banking activity, and safe deposit box trips;

•   a copy of any bank records pertaining to Dan and Krista Long that were used in any one of their several interviews; and

•   a copy of all documents showing distributions received by Vantraxx officers or employees, as referred to by AUSA Ingraham in his October 11, 2007 interview of Peter O'Malley.

Defendant indicated that Morris, the Longs, and O'Malley were all key government witnesses, and that he could not effectively cross examine them without these documents. He contended that these documents were "material to preparing the defense" under Fed. R. Crim. P. 16(a)(1)(E).

The government agreed that the document shown to Morris during an interview with federal law enforcement is discoverable. However, the government initially indicated that since that spreadsheet was the work product of attorneys for SCJ, they were asked to respond as to whether it should be withheld as their work product. At the hearing, the government advised that SCJ was making no such claim, and that it had turned over this document. See In re Lindsey, 158 F.3d 1263, 1282 (D.C. Cir. 1998) ("As a usual rule, disclosure of attorney-client or work product confidences to third parties waives the protection of the relevant privileges; however, when the third party is a lawyer whose client shares an overlapping 'common interest'

with the primary client, the privileges may remain intact.").

The government argued that the bank records of Dan and Krista Long, neither of whom it planned to call as witnesses at trial, were not discoverable. It further argued that information about distributions received by Vantraxx officers, none of whom would be called as witnesses at trial, were not discoverable. Accordingly, the requested documents would not be material to preparing for their cross-examination. Defendant seemed satisfied with this response and did not mention these documents in his reply brief or at the hearing.

**B.      Materials Pertaining to Milt Morris's 2/13/07 Polygraph**:

Defendant further sought:

•       a copy of the results of the polygraph test administered to Morris on February 13, 2007, by SA Gregory Grisham, including a copy of all questions and answers, as well as any other documentation of any statements made by Morris and/or his lawyer in the course of the session;

•       a copy of the curriculum vitae or other qualifications of SA Grisham to conduct a polygraph examination;

•       a copy of any written polygraph procedures or protocol utilized by SA Grisham for the test;

•       a copy of all correspondence between the United States Attorney's Office and/or any agent involved in this case with Morris's lawyer, Steve Kohn, concerning the polygraph test.

Defendant indicated that Morris agreed to cooperate with the government and provide truthful information, signing a proffer letter on June 8, 2006, and submitting to interviews with agents on June 8, 2006, July 28, 2006, and September 21, 2006. Morris, Kohn, and AUSA Ingraham agreed that Morris would submit to a polygraph test, which was administered by FBI

4

agent Grisham on February 13, 2007. It was apparently determined that he lied during the test, and when confronted with the results Morris admitted lying on one question but otherwise insisted that he had told the truth. During a later meeting, Ingraham acknowledged that Morris had failed the polygraph and "stated that he would deal with the consequences of that at a later point in time." Morris provided additional statements to the government on April 20, 2007, and January 29, 2009.

Defendant argued that he is entitled to disclosure of all the facts and circumstances surrounding the polygraph in order to fully assess, and to allow the jury to assess, Morris's credibility. See Giglio v. United States, 405 U.S. 150 (1972). He noted that polygraphs tests may be admissible for cross-examination purposes, United States v. Pulido, 69 F.3d 192, 205 (7th Cir. 1995), and claimed that Grisham's CV and any written test protocol or procedures were material to the defense presentation of the polygraph evidence to a jury, Fed. R. Crim. P. 16(a)(1)(E). He further claimed that he is entitled to know the circumstances under which Morris agreed to take the polygraph test in the first place. Given his apparent failure of the test, and the prosecutor's statements that the consequences of having lied to the government agents would be "dealt with later," defendant claimed that Morris's subsequent motivation to curry favor with the government is a fair subject for cross-examination. Like most communications with cooperating government witnesses, the correspondence regarding Morris taking the polygraph was conducted with his counsel, Steve Kohn, and defendant requested a copy of all such correspondence.

The government agreed that documents related to the polygraph examination were discoverable and turned over such materials prior to the hearing. However, the government did not agree that correspondence concerning the polygraph between counsel must be turned

5

over. The government noted that such attorney correspondence is generally not discoverable and, in any event, in this case the reasons for Morris taking the polygraph were evident from the details of the polygraph itself and the interview that followed it.

After hearing argument at the hearing, I denied the request for attorney correspondence absent a further showing as to why it should be produced. Defendant may cross examine Morris about the exam and any motivation it provided to curry favor with the government in subsequent interviews. He may also question Morris about any evolution of his statements following the polygraph. I did not see how the letters between the AUSA and Kohn setting up the exam, items not generally discoverable under Rule 16 or the government's open file policy, would assist with that.[2]

## C.     **Communications With Cooperating Witnesses and Their Counsel**

Defendant requested production of all documentation of communications between the government and any cooperating government witness, including communications with his or her lawyer. He argued that Brady and Giglio require the government to produce not only proffer letters and plea agreements, but all evidence concerning the events leading up to an agreement with a cooperating witness, whether the agreement is formal or informal, and including communications with counsel. He stated that disclosure is required regardless of whether the negotiations and communications are made to or by the cooperating witness or to or by the witness's lawyer. See Spicer v. Roxbury Correctional Institute, 194 F.3d 547, 556 (4th Cir. 1999) (" For purposes of determining whether evidence is 'favorable' to the defendant,

---

[2] I did ask the government to review correspondence with Morris's attorneys to see whether any contained statements of fact that could be attributed to Morris. The government advises that there are no such items in the attorney correspondence.

6

it is the content of the statements, not their mode of communication to the state, that is important."); United States v. Sudikoff, 36 F. Supp. 2d 1196, 1206 (C.D. Cal. 1999):

> The government must disclose to the defendants all proffers by any witnesses receiving any benefit, whether immunity or leniency, in return for testimony. Included in this category are any proffers made by lawyers for such witnesses. By "proffers" the Court refers to statements that reflect an indication of possible testimony, whether or not it seems likely that the witness would actually so testify. In addition, the government must disclose any notes or documents created by the government that reflect this information. Further, the government must disclose any material that indicates any variations in the witness's proffered testimony.
>
> The government must also disclose to the defendants any information in its possession that reveals the negotiation process by which the immunity agreement was reached. This includes materials authored by a witness, a witness's lawyer, or the government.

The government noted that two cooperating witnesses, Milt Morris and Katherine Scheller, appear to be at issue in this request. The government stated that their plea agreements and proffer letters, which set forth in full their agreements with the government, were available, and that the communications between attorneys for these two witnesses and the government need not be provided to enable fair cross-examination of these witnesses at trial.

After hearing further argument at the hearing, I denied the request for all communications between the cooperators' lawyers and the government. In particular, I noted that disclosure of communications regarding "the negotiation process" by which any immunity or leniency agreements were reached would be unnecessary so long as the final agreements between Morris and Scheller and the government were fully and accurately reflected in the plea agreements and proffer letters defendant already had. Preliminary versions of such agreements may confuse more than enlighten.

However, I did ask the government to review pertinent communications to see whether counsel for the cooperators made any factual proffers to the government (i.e., about what these witnesses would testify to), noting that those communications could be discoverable. The government conducted such a review after the hearing, finding no relevant statements.

In a supplemental memorandum, defendant argued that any e-mails authored by a person who may be a witness at trial must be produced under the Jencks Act, 18 U.S.C. § 3500, if they relate to the subject matter of the witness's testimony at trial. At the hearing, the government agreed to turn over any electronic messages covered by the Jencks Act.

**D.  Agent Interview Notes**

Defendant identified three witness statements referenced in discovery for which no interview report was provided:

• Louis Dudney and his company, Alix Partners, provided forensic accounting assistance to SCJ in the civil case, and SA Ricchio's report of her June 1, 2005, interview of Dudney refers to a previous interview of Dudney on May 10, 2005; no report of the earlier interview exists;

• Inspector Levinson's report of his August 2, 2005, interview of a government witness, John Burch, refers to a prior interview of Burch, for which there is no report;

• In his report of his March 4, 2009, interview with a government witness, Debra Lantz, Inspector Levinson refers to a prior interview of Lantz, for which no report has been provided.

Defendant requested production of the agent interview notes to insure that he had received all the witness statements to which he is entitled. Alternatively, he asked the court to order the prosecution to review the interview notes and produce: notes that document

8

statements made by witnesses that were not reduced to a written report or memorandum; notes that vary from the written memorandum of any interview that has been prepared and produced; notes that contain exculpatory or impeaching information, including inconsistent statements by the witness, that the government is obligated to produce under Brady and Giglio.

The government responded that it did not expect to call Dudney, Burch, and Lantz at trial. However, if any became a likely trial witness, the government stated that it will determine if agent notes of an interview for which no report was generated contain information not already found in an existing report of interview with that witness. If so, the government will turn over any such agent interview notes. Under Brady and Giglio, agent interview notes that materially vary from the reports will also be disclosed. In his reply and at the hearing, defendant indicated that he was satisfied with the government's proposal (as to witnesses it expects to call) to review the interview notes and provide notes that document an interview not otherwise reduced to a written report, notes that vary from any written report, and notes that contain exculpatory or impeaching information.

### III. REQUESTS BASED ON COORDINATION BETWEEN SCJ AND GOVT.

**A. Defendant's Introductory Argument**

Defendant indicated that one of the issues in this case is the extent of cooperation between SCJ and the government, which, he argued, is relevant for several reasons:

- the potential bias of any government witness, including the agents;

- the conduct of the alleged victim in aggressively pursuing parallel civil litigation against defendant, and ultimately taking most of his assets, including his company (the end result of the civil case), would be a relevant consideration at sentencing – as was the degree

9

of cooperation between S.C. Johnson and the government in bringing about that result;

• the degree of cooperation was relevant to the government's obligation to seek out Brady/Giglio material in the hands of S.C. Johnson and its lawyers;

• the degree of cooperation was relevant to whether the coordinated civil and criminal investigations constituted a "departure from the proper administration of criminal justice," see United States v. Kordel, 397 U.S. 1, 13 (1970), an inappropriate pre-charging delay, or an excessive forfeiture (based on the judgment ultimately obtained by S.C. Johnson).

Defendant noted that it appeared the government and SCJ coordinated early on in the case. On October 14, 2004, federal law enforcement officers received information from SCJ that it had been the victim of a theft scheme orchestrated by Morris. On October 14, 2004, Magistrate Judge Callahan issued a search warrant for the offices of Morris and Scheller based on the application of Inspector Levinson, which was based entirely on information provided by SCJ. On October 18, 2004, Morris was interviewed at SCJ by Inspector Levinson, Gayle Kosterman (an SCJ attorney) and Thomas Gallo, a private investigator employed by SCJ's outside law firm, Kirkland & Ellis. On that date, Morris signed a statement prepared by Gallo. On October 18, 2004, at 9:53 a.m. SCJ's lawyers at Kirkland & Ellis and Reinhart, Boerner filed the first complaint in the civil lawsuit in Racine County Circuit Court. At 5:00 p.m. that day, federal agents executed the search warrant issued three days earlier by Magistrate Judge Callahan. Present during the execution of the search warrant were Jeffrey Willian from Kirkland & Ellis and Dave Hecker, an in-house SCJ lawyer. On October 26, 2004, on the government's motion, Magistrate Judge Callahan sealed the search warrant for 90 days because disclosure would "adversely affect the ongoing criminal investigation."

Defendant also noted that the government and SCJ jointly interviewed several witnesses

10

in the case. In one instance, defendant contended that the government obtained a subpoena for records that one witness declined to turnover voluntarily to an SCJ investigator.[3] Defendant asked for the following materials related to SCJ.

**B.     Documents Provided by SCJ to the Government**

Defendant argued that the government should be ordered to produce the documents provided by SCJ; alternatively, the government should be ordered to produce a summary or index of the documents received from SCJ describing the items received, the date received by the government, and the person from whom they were received. This request included any notes, memoranda, or other documentation from a lawyer acting on behalf of SCJ at the time the documents were produced.

The government agreed to produce all discoverable materials, from whatever source obtained, but argued that there was no basis for requiring it to turn over all materials received from SCJ, most of which were irrelevant, or to create an index. I agreed. I saw no reason to require disclosure of all documents, even those not discoverable under Rule 16 or Brady, just because they came from SCJ. Defendant provided no authority for such a broad and unusual discovery order.

**C.     SCJ-Government Communications**

Defendant requested production of all e-mails, text messages, letters, notes, memoranda, or documentation of any kind reflecting or relating to correspondence or other communication between SCJ and any government agent or prosecutor involved in the

---

[3]As the government noted in its response, however, documents it obtained via grand jury subpoena could not be shared with SCJ due to grand jury secrecy rules. This controverted defendant's suggestion that the government may have subpoenaed records for SCJ's benefit.

11

investigation and/or prosecution of this case, from January 1, 2004, to the present. These documents, he argued, were relevant to establishing the coordinated SCJ-government effort, and to exploring possible bias of government witnesses.

The government responded that there was nothing improper about the cooperation here, and that requiring the turnover of all such communications could chill future cooperation by crime victims. The government also noted that defendant pointed to nothing specific in the government-SCJ relationship suggestive of bias.

I agreed with the government. As a general matter, I failed to understand why it was improper for SCJ and the government to cooperate. Alleged victims of crime regularly cooperate with the government's prosecution of the individuals who allegedly victimized them. Defendant could perhaps cross-examine the government's witnesses to see if there were biased in SCJ's favor, but I saw nothing nefarious in this case. Obviously, government investigators and prosecutors believed that a crime was committed against SCJ, based in part on information SCJ provided, or they would not have brought this case. This does not make them "biased."

Defendant has not yet filed any pre-trial motion alleging improper pre-charging delay or other defect in the initiation of the proceedings based on the SCJ/government cooperation. At the hearing, I set a new deadline for the filing of a motion to dismiss. I can, if necessary, revisit this issue upon review of the motion. Further, I can consider arguments pertaining to sentencing or excessive forfeitures based on the effects of the civil litigation if defendant is convicted and must be sentenced.

As indicated above, any communications from SCJ personnel that fall under the Jencks Act or are otherwise subject to discovery under Rule 16 must produced. But I saw no need to

require production of every single communication between SCJ and the government for the past seven years.

**D.    SCJ Internal Investigation**

Defendant asked that, if the government has been provided a copy of SCJ's internal investigation of this matter, the government be compelled to produce that report, along with any supporting documents and materials. Had the government been in possession of these materials, I likely would have required their production under Brady and Rule 16(a)(1)(E). See United States v. Bergonzi, 216 F.R.D. 487 (N.D. Cal. 2003). However, the government indicated that it does not have the report. The government further noted that this report was discussed in some detail at the civil trial. The government indicated that all items it possesses in connection with the search warrant have been turned over in discovery. In his reply, defendant argued that the government should be required to obtain the report from SCJ, along with the other documents referenced in request III.E. below.

**E.    Material to be Sought Out From SCJ**

Because of the coordinated effort between SCJ and the government, defendant requested that the government be ordered to seek out certain discovery materials from SCJ, its in-house lawyers, its lawyers at Kirkland & Ellis and Reinhart, Boerner, and any private investigator employed by the company or its lawyers. He cited a DOJ memo obligating prosecutors to seek out materials not only in the hands of the investigative agency in the case, but "documents or evidence gathered by civil attorneys and/or a regulatory agency in parallel civil investigations." As he conceded, this refers to civil investigations by government agencies, not by private parties. Nevertheless, he argued that SCJ and its lawyers should be considered

13

part of the government team here.

As a general matter, the government is only required to produce in discovery materials in its "possession, custody, or control." Fed. R. Crim. P. 16(a)(1)(E). Likewise, courts have noted that Brady generally does not oblige the government to obtain evidence from third parties. United States v. Combs, 267 F.3d 1167, 1173 (10th Cir. 2001); see also United States v. Tierney, 947 F.2d 854, 864 (8th Cir. 1991) ("It is well settled that there is no 'affirmative duty upon the government to take action to discover information which it does not possess.'") (quoting United States v. Beaver, 524 F.2d 963, 966 (5th Cir. 1975) (1976)). Generally, a defendant seeking exculpatory evidence from third parties must do so via subpoena under Rule 17(c), rather than a demand of the government. See, e.g., United States v. Libby, 432 F. Supp. 2d 26, 30 (D.D.C. 2006); United States v. King, 194 F.R.D. 569, 574-74 (E.D.Va. 2000); see also United States v. Tomison, 969 F. Supp. 587, 593 (E.D. Cal. 1997) (noting that, in cases where evidence relevant to guilt or punishment is in a third party's possession and is too massive for the defendant to adequately review unless obtained prior to trial, pre-trial production through Rule 17(c) may be granted).

Defendant cited several cases where courts required production of materials from third parties, but none supported his position here. In United States v. Kilroy, 523 F. Supp. 206, 209 (E.D. Wis. 1981) (Reynolds, J.), the defendant managed a Sharon, Wisconsin fertilizer plant for Amoco Oil, a division of Standard Oil. The government alleged that he devised and put into effect a scheme to divert payments made to Amoco to his own use, by means of having customers write personal checks to him and also of converting checks written to Standard Oil to his own use, and then mailing an adjustment memo to Amoco Oil Co., falsely reflecting a product return by the customer. He also failed to mail "scale tickets," which were used to write

14

up sales, to Amoco for sales in which he diverted payments, and then induced other customers to prepay on sales and mailed false scale tickets to Amoco reflecting sales in the amount of the prepayments so that Amoco would reduce its accounting of inventory.

The defendant sought various documents in discovery, including the checks, adjustment memos, scale tickets, bank documents and other documents on which the indictment was based, including his own bank statements. Id. at 214. The government agreed to make available all the documents listed in the request in its possession or control, but stated that it did not have and never sought to obtain certain of the defendant's bank records. Id. The defendant also sought an order requiring the government to turn over to him all documents which were in his office at the time he was fired by Standard Oil and which Standard Oil refused to return to him or to allow him to review. Id. at 215. The court stated:

> I see no objection to an order requiring the Government, as the defendant asks, to use its "best efforts" to obtain from Standard Oil all of the documents in its possession which came out of the defendant's former office. The Government has 30 days to try to obtain the records. Standard Oil is admittedly not a party to this suit and has no obligation to turn over any of its records to the defendant or to the Government except at trial pursuant to a valid subpoena. Since Standard Oil is cooperating with the Government in the preparation of the case and is making available to the Government for retention in the Government's files any records which Standard Oil has and which the Government wants, however, it is not unreasonable to treat the records as being within the Government's control at least to the extent of requiring the Government to request the records on the defendant's behalf and to include them in its files for the defendant's review if Standard Oil agrees to make them available to the Government. The alternative course is to require the defendant to subpoena the records for production at trial and, at the time of production, to grant him a recess adequate to allow him to thoroughly review the records. I see no need for disruption of the trial in that manner when it appears that the records are.
>
> As for the defendant's bank records not relating to Standard Oil, not in the Government's possession, and which are not within the category of records which the Government's summary witness reviewed in preparation for testifying, however, the Government and the defendant have equal access to the records and I am not persuaded even if because the defendant is proceeding in forma

15

> pauperis the Government ultimately will bear the cost of the "expenses reasonably incurred" by the defendant in obtaining the records, 18 U.S.C. s 30006A(d)(1), that the Government should bear the burden of obtaining the copies of the records. See Rule 16(a)(1)(C) of the Federal Rules of Criminal Procedure. The Government's position is that the records are irrelevant. Thus it is the defendant, if he believes to the contrary, who should make the determination of which, if any, of the records are in fact relevant and which should be obtained for his use at trial.

Id.

Defendant cited the language from Kilroy about the records "practically speaking, [being] within the Government's control." However, Judge Reynolds required only that the government make its "best efforts" to obtain the records, and he did not purport to require a third party turn them over. Further, I do not see how a court could enter such an order; neither Standard Oil in Kilroy, nor SCJ in this case, would appear to be under the court's jurisdiction. Thus, if the court were to order the government to obtain the records from SCJ, and SCJ declined, it is hard to see what the court could then do about it.

In United States v. Stein, 488 F. Supp. 2d 350 (S.D.N.Y. 2007), the defendants, officers and employees of financial services firm KPMG, were charged with tax evasion and criminal conspiracy in connection with the creation of allegedly illegal tax shelters. The defendants moved to compel the government's production of certain materials, including documents from KPMG files. KPMG had previously entered into a Deferred Prosecution Agreement ("DPA"), which, inter alia, obliged KPMG to cooperate with the government, both in general and in the government's prosecution of the defendants' indictment, including by disclosing all information about activities of KPMG, present and former partners, employees, and agents of KPMG. Id. at 353. In considering the defendants' discovery motion under Fed. R. Crim. P. 16(a)(1)(E), the court noted that the DPA gave the government "the legal right to obtain these documents,"

16

thus satisfying the Rule's "possession, custody or control" requirement. Id. at 362-63. There is no similar DPA or other legal requirement that SCJ cooperate with the government in this case. Thus, Stein is distinguishable.

In United States v. Skeddle, 176 F.R.D. 258, 262 (N.D. Ohio 1997), in response to a discovery request, the court stated that "it appears appropriate to direct the government to undertake forthwith to retrieve any documents that once were in its possession but remained with LOF and which are 'material to the preparation of the defense' and provide those materials as promptly as reasonably possible to the defendants." Assuming that it may be appropriate to hold that the government maintains custody or control (if not possession) over documents it once possessed but later returned, there is no indication that the government once had but returned to SCJ the documents defendant seeks now.

Thus, as I indicated at the hearing, if defendant wants documents from SCJ, he needs to subpoena them.[4] Further, it appears that defendant obtained, or could have obtained, relevant documents from SCJ in the civil litigation. See, e.g., United States v. Tadros, 310 F.3d 999, 1005 (7th Cir. 2002) ("The Brady rule does not apply to evidence not in the possession of the government that a defendant would have been able to discover himself through reasonable diligence.").

In his reply brief, defendant asked for an evidentiary hearing (1) regarding the coordination between the government and SCJ so that the parties could make a complete factual record in order for the court to rule on the pending discovery motion (at least the

---

[4]Because I see no legal basis for discovery, I have not specifically gone over the list of documents defendant wanted the government to get from SCJ, which are set forth on pages 26-31 of his memorandum.

17

requests outlined in section III. of the motion), and (2) with respect to the defendant's anticipated motion to dismiss the indictment on the grounds that the coordinated civil and criminal investigations departed from the proper administration of criminal justice, pursuant to United States v. Kordel, 397 U.S. 1, 13 (1970). At the status, I set a return date for defendant's anticipated Rule 17(c) subpoenas and a deadline for the filing of a motion to dismiss. I will review that motion and determine whether a hearing is necessary.

**SO ORDERED.**

Dated at Milwaukee, Wisconsin, this 18th day of July, 2011.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge